**Todd A. Parker, MD, FACEP, FAAEM**

***Board Certified in Emergency Medicine***

**Re:** Formeka Ball, deceased
**Date of Report:** June 16, 2025

**Qualifications:** I am an Emergency Medicine Physician certified by the American Board of Emergency Medicine, a Fellow of the American College of Emergency Physicians, and a Fellow of the American Academy of Emergency Medicine. I am an Attending Physician and community faculty for Riverside Health in multiple Emergency Departments in Southeast Virginia. I am also the Executive Medical Director of the Riverside Health Integrated Care Command Center. I am the Immediate Past President of the Virginia College of Emergency Physicians. I was formerly the Acting Department Chair, Assistant Chair, and Medical Director of the Emergency Department at Naval Medical Center Portsmouth, VA. I was formerly an Assistant Professor of Military and Emergency Medicine at the Uniformed Services University of the Health Sciences in Bethesda, MD. As an Emergency Medicine Physician, I personally manage and/or supervise the management of all cases presenting to the Emergency Department including trauma and medical illnesses. I am an expert in the recognition and management of conditions that present to the Emergency Department setting. I am also a subject matter expert on numerous topics related to Emergency Medicine of which I have lectured regionally and nationally and am an Editor and chapter author of a major Emergency Medicine board review textbook published by the American Academy of Emergency Medicine. Since I am community faculty in Emergency Medicine, I train medical students, Emergency Medicine residents, and physician assistant students in all aspects of Emergency Medicine.

**This is an abbreviated report, to provide a summary of my conclusions. It is not a comprehensive report, as such some details are omitted. I reserve the right to modify or expand on any conclusions as more information becomes available.**

**Documents reviewed:**

1. **Merit Health River Oaks medical records from ER Visit 10/2/2023.**
2. **Florence Family Clinic Medical Records**
   a. **12/7/2020**
   b. **06/09/2021**
   c. **06/21/2022**
   d. **03/31/2023**
   e. **09/28/2023**
3. **Certificate of Death 10/16/2023**
4. **Pafford EMS Report – 10/3/2023**

EXHIBIT
tabbies
A

**Case:**

Ms. Formeka Ball presented to the Emergency Department (ED) of Merit Health River Oaks hospitals 10/2/2023. She had a history of hypertension and had been seen several days prior by her primary care for minor respiratory illness symptoms. She had a chief complaint of sudden onset left-sided chest pain that had started earlier that morning just prior to the Emergency Department visit. She was seen by PA Patrick Lewis who was supervised by Victoria Ross, DO. Her ED medical records were significant for history and review of systems pertinent positives of persistent left-sided chest pain radiating to the left flank, shortness of breath, sweats, and tingling to the left hand. Her symptoms were reported as not being exacerbated by movement or activity and not relieved by rest.

Her vital signs were essentially normal except she was mildly hypertensive with a blood pressure of 154/89. Her physical exam was reported as normal. Of note is that there is no documentation of tenderness to palpation of the chest wall or reproducibility of her pain with palpation or movement. After an initial evaluation that included blood work, an electrocardiogram, and a chest x-ray, she was discharged from the ED with a diagnosis of chest wall pain and given anti-inflammatory medications and instructions to follow up with her primary care doctor in one week.

She was last seen normal by her family before bed that evening and was found by her daughter the next morning unresponsive. EMS arrived and found her pulseless and not breathing. An AED indicated that no shock was advised, and she had physical signs that she had been dead for several hours. She was pronounced dead on the scene with a cause of death of cardiac arrest, and the coroner signed the death certificate indicating the same contributed to by hypertension. No autopsy was performed, but a post-mortem toxicology report indicated only caffeine in her blood.

**Discussion:**

Ms. Ball presented to the ED with a history & physical that is a "textbook" case of how cardiac ischemia presents; therefore, an appropriate and full cardiac workup was mandated however was not done. While the initial management plan after obtaining the history and physical was adequate, and initial testing was appropriate, given the findings and symptoms described by PA Lewis, at a minimum a second or further Troponin tests, and observation for a longer period of time, were mandated under these circumstances.

When determining whether a cardiac workup is indicated, and what is required as a part of that workup, there are several clinical guidelines but by far the most common one used in the ED setting to assess the initial risk of a cardiac etiology as the source of the pain is the HEART score and HEART pathway. In fact, use of the HEART score for initial risk stratification is the highest-level recommendation in the American College of Emergency Physicians Clinical Guidelines for evaluation chest pain. See

https://www.mdcalc.com/calc/1752/heart-score-major-cardiac-events.

Based on the information available to PA Lewis, Ms. Ball had a HEART score of at least "4":

- 1 point for "Moderate Suspicion" given her sudden chest pain, shortness of breath, radiation to the flank, numbness and tingling in the left hand, diaphoresis, and lack of reproducibility.
- 1 point for age >45
- 1 point for non-specific ECG changes, and
- 1 point for risk factors (Hypertension).

It could even be argued that her history score should be a "2" given that the symptoms are considered classic for myocardial ischemia, which would have given her a HEART score of "5". Either way, this placed her in a moderate risk category and required at a minimum additional observation and testing in the ER. Depending on the results of the additional testing, hospital admission for observation or intervention could also be mandated. Simply, when the onset of pain is <3 hours of the ED presentation, or when the patient exhibits moderate or higher statistical likelihood that their pain is cardiac, results of the single troponin test cannot be used to rule out cardiac as the source of the symptoms, and need to be compared to at least one more to see if the biomarker is rising. Given the patient's presenting symptoms, statistical likelihood of a cardiac source of her pain, the time since the pain started, and the detectable hsTroponin, further testing was required before determining whether she was safe to be discharged home. In fact, the standard of care endorsed the American College of Emergency Physicians in their 2018 guidelines and 2021 updates including hsTroponin utilization states that:

1. "In adult patients without evidence of ST-elevation acute coronary syndrome, the History, ECG, Age, Risk factors, Troponin (HEART) score can be used as a clinical prediction instrument for risk stratification. A low score (≤3) predicts a 30-day major adverse cardiac event miss rate within a range of 0% to 2%", and that:

2. "A single high-sensitivity troponin (hsTroponin) result below the level of detection on arrival to the emergency department, or negative serial high-sensitivity troponin result at 0 and 2 hours is predictive of a low rate of major adverse cardiac events" (This patient had a detectable but negative high-sensitivity troponin therefore a single troponin was not sufficient), and that:

3. "In adult patients with suspected acute non–ST-elevation acute coronary syndrome who are determined to be low risk based on validated accelerated diagnostic pathways that include a nonischemic ECG result and negative serial high-sensitivity troponin testing results both at presentation and at 2 hours can predict a low rate of 30-day major adverse cardiac events allowing for an accelerated discharge pathway from the emergency department." (In this case the patient was moderate risk, not low risk, but even low risk requires a repeat 2-hour troponin).

4. In cases of low but detectable hsTroponin levels, serial testing can help exclude MI.

https://www.acep.org/patient-care/clinical-policies/nonst-elevation-acute-coronary-syndromes
https://www.acep.org/patient-care/policy-statements/use-of-high-sensitivity-cardiac-troponin-in-the-emergency-department

Further, the American Heart Association (AHA)/American College of Cardiology (ACC) 2021 Guidelines on Evaluation and Diagnosis of Chest Pain, and use of High Sensitivity Troponin in the 2021 AHA/ACC Guidelines, both indicate that a clinical stratification tool (HEART is by far the most common) and serial troponins should be obtained.

https://www.ahajournals.org/doi/10.1161/CIR.0000000000001030
https://www.ahajournals.org/doi/10.1161/CIRCULATIONAHA.122.059678

Recommendations for Patients With Acute Chest Pain and Suspected ACS (Not Including STEMI)
Referenced studies that support the recommendations are summarized in

| COR | LOE | Recommendations |
|---|---|---|
| 1 | B-NR | 1. In patients presenting with acute chest pain and suspected ACS, clinical decision pathways (CDPs) should categorize patients into low-, intermediate-, and high-risk strata to facilitate disposition and subsequent diagnostic evaluation.[40-52,78] |
| 1 | B-NR | 2. In the evaluation of patients presenting with acute chest pain and suspected ACS for whom serial troponins are indicated to exclude myocardial injury, recommended time intervals after the initial troponin sample collection (time zero) for repeat measurements are: 1 to 3 hours for high-sensitivity troponin and 3 to 6 hours for conventional troponin assays.[35,56,77] |
| 1 | C-LD | 3. To standardize the detection and differentiation of myocardial injury in patients presenting with acute chest pain and suspected ACS, institutions should implement a CDP that includes a protocol for troponin sampling based on their particular assay.[78,79] |
| 1 | C-LD | 4. In patients with acute chest pain and suspected ACS, previous testing when available should be considered and incorporated into CDPs.[80-84] |
| 2a | B-NR | 5. For patients with acute chest pain, a normal ECG, and symptoms suggestive of ACS that began at least 3 hours before ED arrival, a single hs-cTn concentration that is below the limit of detection on initial measurement (time zero) is reasonable to exclude myocardial injury.[51,85-89] |

Based on her presenting symptoms and initial risk stratification, not only was the evaluation inadequate, but the medical decision making was also inconsistent and not plausible or congruent with her presentation. Her initial symptoms were classic for cardiac ischemia, however when she was told that her initial results were reassuring, the patient mentioned an auto accident a couple of days earlier when her car hit a deer. Inexplicably, and not having any evidence to support this diagnosis, PA Lewis then seemed to "pivot" to a ribcage injury as an explanation for her symptoms and discharged her with a diagnosis of "chest wall pain" and a musculoskeletal cause.

This is not a plausible explanation for her presenting symptoms. First, the "sudden onset" of persistent left sided chest pain radiating to her upper flank, her persistent shortness of breath, and "sweats" (also known as diaphoresis) would not be typical symptoms from a motor vehicle accident two days earlier. Musculoskeletal motor vehicle accident pain may not be present initially but will gradually appear then worsen starting shortly after the accident. This type of pain can gradually worsen for several days after an accident, but it is not "sudden" in onset 2 days later. Further, her pain was described by PA Lewis as <u>not</u> exacerbated by movement or activity and not relieved with rest. Were the symptoms due to a musculoskeletal injury, her symptoms should have been <u>exacerbated</u> by movement and activity, and/or relieved with rest. Finally, musculoskeletal chest pain is almost always reproducible on exam; palpation of painful area, compressing the chest, moving the arms, having the patient take deep inspirations, or twisting the patient are common ways to elicit reproducibility. Under any circumstances, diagnosing musculoskeletal chest pain requires some degree of reproducibility. None of this was done or documented, in fact documentation was to the contrary, and the diagnosis of chest wall pain was made solely by the patient telling the provider that she "remembered" she was in an accident two days prior. Given the history and review of systems that are highly indicative of a cardiac cause, and history, review of systems, and physical exam findings that are not indicative of musculoskeletal chest wall pain, the medical decision making is entirely inconsistent with the rest of the patient presentation.

The initial history, review of systems, and exam findings made by PA Lewis actually <u>endorsed</u> cardiac issues as the primary concern (also supported by his differential diagnosis of STEMI, NSTEMI, and Angina). Based on this presentation and her HEART score, a cardiac cause was "high" on the differential diagnosis list for this patient at the time of her evaluation. There was no evidence or support on physical examination for a musculoskeletal injury diagnosis, and she presented with classic symptoms of cardiac-related chest pain that required at a minimum additional testing and observation, and possibly prompt medical intervention.

She was found dead the next day due to "cardiac arrest" as the primary cause (according to EMS records and the Certificate of Death. Considering all the evidence, it is more likely than not, in fact even highly likely, that Ms. Ball died of a blockage of her coronary artery (coronary thrombosis) leading to myocardial ischemia and myocardial infarction, culminating in cardiac arrest and death. More likely than not, had she received prompt

medical intervention – been admitted to hospital and afforded standard of care treatment – she would not have died. The failure to properly recognize the seriousness of her presenting symptoms, and adequately perform testing and observation to rule out a cardiac issue as being responsible for her symptoms, combined with the inappropriate attribution of her pain to a musculoskeletal etiology, caused her to miss appropriate medical intervention and treatment and caused and/or contributed to her death.

While there is an attending physician (Dr. Victoria Ross, DO) assigned, the chart does not have any attending physician documentation and it is unclear whether the doctor cosigned the chart (but appears she did not) as there is no electronic signature day/time stamp over her name. It is unclear whether Dr. Ross saw the patient and endorsed the findings, conclusions, and disposition of the patient by the PA – in which case the doctor is implicated – or was not involved which would be an institutional failure by Merit Health River Oaks. A health system must have in place a policy of adequate Physician Assistant supervision, and if the supervision policy exists then this case is a failure of the Physician Assistant to seek out the assistance of the Attending Physician, especially for the care of a patient with such a high-risk differential diagnosis list. It would be below the standard of care for any hospital to discharge a patient at moderate risk of cardiac ischemia and a major adverse cardiac event risk of 12-16% in the next 6 weeks, with these symptoms under these circumstances, without a review and consultation by a medical doctor.

As such, Ms. Ball was not appropriately evaluated based on her presenting symptoms and initial testing results and was inappropriately discharged from the hospital in violation of the standard of care for patients with her symptoms and findings under these circumstances. She was at the hospital for about 90 minutes, from 10:41 AM to 12:22 PM.

Although the death certificate claims that a post-mortem was performed, consultation with the patient's mother after our conference revealed that no autopsy was, in fact, undertaken. The cause of death was certified as cardiac arrest which is likely accurate.

**Conclusions:**

1. Ms. Formeka Ball was seen in the Emergency Department on October 2, 2023, with symptoms that were classic and moderate to high risk of cardiac ischemia.
2. While the initial testing and evaluation was appropriate, the mandatory follow-on testing, evaluation, and observation based on risk stratification was not performed.
3. Further, her diagnosis and the medical decision making for this diagnosis were contradicted repeatedly in the record and not plausible based on the information presented. Simply, despite evidence to the contrary, a benign, self-limiting diagnosis was given and the more plausible, and far more dangerous diagnosis was ignored.
4. The standard of care in an Emergency Department is to rule out threats to life and limb first before attributing symptoms to a non-emergent diagnosis.

5. Therefore, in the case of Ms. Formeka Ball, the Standard of Care was not met, and the care provided by PA Lewis was negligent.
6. Ms. Ball more likely than not was suffering from intermittent cardiac pain before her ED presentation, which is often a precursor to myocardial infarction and cardiac arrest.
7. Ms. Ball's death was most likely due to myocardial infarction leading to cardiac arrest, and had she been observed longer with additional testing.
8. More likely than not" had Ms. Ball received timely medical intervention (additional testing and observation she would have survived.
9. In addition to providing negligent care that did not meet the standard of care, a patient with these symptoms and risk should have involved consultation with a physician. It is uncertain at this time, but there is either negligence on the part of PA Lewis for not involving a physician in her care, on the part of Dr. Ross for not seeing the patient, or on the hospital for not requiring Dr. Ross to provide adequate supervision of PA Lewis.

***The conclusions reached in this report are based on my education, training, and experience. These conclusions are all within reasonable medical probability. This report is based on the material I have been asked to review as of June 16, 2025. I reserve the right to amend this report should further information become available.***

Todd A. Parker, MD, FACEP, FAAEM
*Electronically signed 16 June 2025*

*Ronald H. Wharton MD*
*50 Finch Drive*
*Roslyn, NY 11576*

June 29, 2025

Chip Wagar III, Esq.
Wagar Hickman LLC
1401 W. Causeway Approach
Mandeville, LA 70471

RE: Ms. Formeka Ball, D.O. Birth 9/18/1977

Dear Mr. Wagar:

I am a physician certified in cardiovascular disease by the American Board of Internal Medicine. I received my medical degree from the College of Physicians and Surgeons of Columbia University in 1989. I completed a residency in Internal Medicine at Montefiore Medical Center in Bronx, NY, followed by a fellowship in cardiovascular disease at Maimonides Medical Center in Brooklyn, NY. I am currently an Associate Professor of Cardiology at the Zucker School of Medicine of Hofstra University, NY, and an attending cardiologist at North Shore University Hospital, Manhasset, NY.

I have reviewed the following records pertaining to Ms. Formeka Ball:

- Florence Family Clinic: December 7, 2020, through September 28, 2023
- Merit Health River Oaks Emergency Department: October 2, 2023
- NMS Toxicology Report: October 12, 2023

It is my opinion that the care which Ms. Ball received in the emergency department of Merit Health River Oaks on October 2, 2023, deviated from the standard of care. The failure to consider the diagnosis of an acute coronary syndrome resulted in the loss of Ms. Ball's life.

**Pertinent Medical History:**

Ms. Formeka Ball was a non-diabetic woman who never smoked. She had a history of hypertension. Other potential risk factors for coronary disease such as lipid levels and family history are not available to me. She was last seen by her primary medical provider on September 28, 2023, for symptoms which were consistent with an upper respiratory infection.

Ms. Ball sought care at the Emergency Department (ED) of Merit Health River Oaks on October 2, 2023. The triage nurse documents the chief complaint of "L sided chest pain that started morning" at 10:45 AM.

Ms. Ball was evaluated by Physician Assistant Patrick T. Lewis, who obtained a history which includes the following: "presents to the emergency room with the chief complaint of sudden onset left-sided chest pain associated shortness of breath started earlier this morning". These symptoms were noted to be "persistent" and not "exacerbated by movement, activity, or relieved with rest". Associated symptoms included "tingling in her left hand" and "waking up in a cold sweat".

Ms. Ball was found to be mildly hypertensive (blood pressures 154/89, 141/87) and mildly tachypneic (respiratory rate 18-20/min). The remainder of the vital signs and her physical examination were reported as normal, as was a chest x-ray. A 12-lead electrocardiogram was obtained at 10:51AM. I have reviewed this tracing. In my opinion, this electrocardiogram was normal.

In addition to a comprehensive metabolic profile and complete blood count, both of which were unremarkable, a high sensitivity cardiac troponin-I ("Troponin I HS") was obtained, the level of which was 7.2 ng/cc (reference range < 53.7 ng/cc). Regarding the Troponin I HS, the lab report specifically states, "recommend serial monitoring" (p. 45). All the lab values appear to have been resulted between 11:29 – 11:46 AM. At 12:24 PM, Ms. Ball was discharged from the emergency department.

I cannot find any documentation that Ms. Ball was evaluated by the supervising physician, Dr. Victoria Ross.

I have been informed by counsel that Ms. Ball was found unresponsive by her daughter the following morning. Emergency medical personnel reportedly found her pulseless and apneic. An AED analysis advised against defibrillation, and physical findings suggested she had died several hours earlier. She was pronounced dead at the scene. The official cause of death was documented as cardiac arrest with hypertension listed as a contributing factor. No autopsy was performed; post-mortem toxicology revealed only caffeine in her system.

**Discussion:**

The HEART score is a widely used tool for triage of patients who present with a chest pain syndrome to an emergency department.

The clinical presentation outlined in Ms. Ball's case aligns closely with a textbook example of acute coronary syndrome (ACS). Left-sided chest pain, shortness of breath, tingling in the left hand, and waking up in a cold sweat are cardinal symptoms of myocardial ischemia and should be treated as such until proven otherwise. This would yield a HEART score of 2 points. The patient's age gives one additional point. The history of hypertension adds one additional point, for a total of 4 points. This score may have been higher, as additional risk factors for coronary disease were not known when the patient was being evaluated.

Given the heart score of at least 4, the standard of care in the initial evaluation of Ms. Ball would demand an additional Troponin I HS two hours later. An additional electrocardiogram may have also yielded important clinical information.

An acute coronary syndrome is not a static process. It is the clinical manifestation of a delicate balance between coronary thrombosis and thrombolysis and can be deceptively subtle when initially evaluated. No constellation of "normal" findings excludes this diagnosis when viewed in isolation, i.e. without being repeated at least two hours later. Doing so ensures that patients will not be sent home with a potentially fatal diagnosis that could otherwise be intervened upon with no long-term morbidity.

Ms. Ball should have been kept in the emergency department until serial testing, the standard of care, could have been completed. Consultation with a cardiologist would have also been appropriate, as the history was classic for that of an acute coronary syndrome. Had these things been done, it is extremely likely that positive findings would have led to further testing and treatment such that she would have survived.

Lack of further evaluation or consultation with a supervising physician, compounded by her premature discharge tragically allowed the progression of a likely undiagnosed acute myocardial infarction which led to Ms. Ball's death. This oversight highlights the critical importance of adhering to established protocols for suspected ACS, ensuring timely diagnosis and intervention.

**Conclusions:**

1. The presenting symptoms described in the chart by Ms. Ball mandated that an acute coronary syndrome be ruled out as the cause of her symptoms.
2. Having spent less than two hours in the emergency department, the initial evaluation for a possible acute coronary syndrome could not possibly have been adequate.
3. More likely than not, Ms. Ball was undergoing coronary thrombosis at the time of her admission and discharge from the Merit Health River Oaks hospital.
4. More likely than not, Ms. Ball died from complications of an acute myocardial infarction.
5. River Oaks hospital's failure to have the patient evaluated by a medical doctor, as documented in the medical chart, was below the standard of care and caused/contributed to her eventual discharge and demise.
6. Ms. Ball was misdiagnosed with a musculoskeletal injury at the time of her premature discharge from Merit Health River Oaks hospital.
7. Ms. Ball should have been evaluated by a cardiologist after which she likely would have undergone further observation, testing, and treatment of her acute coronary syndrome (which may have required transfer to a facility capable of a higher level

of care). Had she received such in a timely manner, she would have survived this event.

The conclusions reached in this report are based on my education, training, and experience, and are all within reasonable medical probability. This report is based on the material I have been asked to review as of June 29, 2025. I reserve the right to amend this report should further information become available.

Ronald H Wharton

Ronald H. Wharton MD, FACC, FASE