UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

PATRICIA BALL                                                                      PLAINTIFF

V.                                                      CIVIL ACTION NO. 3:24-CV-632-DPJ-ASH

RIVER OAKS HOSPITAL, LLC, ET AL.                                          DEFENDANTS

ORDER

This medical-negligence/wrongful-death case is before the Court on three motions for summary judgment or partial summary judgment [84, 89, 92] and one motion to strike Plaintiff's causation experts [86]. The motion to strike [86] is denied, and the Court will grant summary judgment as to: (1) direct-liability claims against Defendant River Oaks Hospital, LLC (River Oaks); (2) claims under the Emergency Medical Treatment and Active Labor Act (EMTALA) against River Oaks; (3) and punitive damages against River Oaks and Defendant Jackson HB Medical Services, LLC (Jackson HB). The motions are otherwise denied.

I.      Background

On October 2, 2023, Formeka Ball arrived at the Merit Health River Oaks emergency room. Emergency room records describe Ms. Ball as presenting with "sudden onset left-sided chest pain [and] associated shortness of breath that started earlier this morning." ER Records [85-1] at 2. Ms. Ball stated that she had "a tightness sensation in the left respiratory chest that . . . radiate[s] to her left upper flank." *Id.* She descried the pain and shortness of breath as "persistent, not exacerbated by movement, activity or relieved with rest." *Id.* She also mentioned "tingling in her left hand" and said that she woke up "in a cold sweat this morning." *Id.*

The attending physician listed in the medical records was Dr. Victoria Ross. *Id.* at 7. Ms. Ball's ER presentation was managed by Physician Assistant Patrick Lewis. River Oaks Mem. [85] at 2 (Undisputed Facts); *see also* ER Records [85-1] at 4. As part of the triage, Ms. Ball received an electrocardiogram (EKG), a chest x-ray, a complete blood test panel (CBC), and one troponin test. ER Records [85-1] at 2–3.

The initial testing did not produce a "significant finding." *Id.* at 3. Her EKG showed a "T wave inversion" but was otherwise "without significant finding," and her chest x-ray "was normal." *Id.* While discussing these results, Ms. Ball mentioned that "she was in a car accident 2 days ago where her car struck a deer." *Id.* (unaltered). The primary impression was therefore listed as "Musculoskeletal chest pain." *Id.* at 3. She was discharged later that day, *id.*, with a handout on "Nonspecific Chest Pain," *id.* at 7. "Tragically, [Ms. Ball] died the following morning." River Oaks Mem. [85] at 3 (Undisputed Facts).

While treating Ms. Ball, PA Lewis and Dr. Ross "were acting in the course and scope of their employment" with Jackson HB. *Id.* at 2. "Jackson HB was the exclusive provider of emergency physician and mid-level provider services for Merit Health River Oaks." *Id.* at 3.

On October 15, 2025, Plaintiff Patricia Ball (Plaintiff), Ms. Ball's mother and the administratrix of her estate, sued River Oaks, Jackson HB, and John Does #2–10. *See* Compl. [1]. She alleges six counts: (1) medical negligence against both Defendants, (2) vicarious liability against both Defendants, (3) breach of warranty against both Defendants, (4) wrongful death against both Defendants, (5) violation of EMTALA against River Oaks, and (6) gross negligence and punitive damages against both Defendants. 2d Am. Compl. [25] at 4–8.

After discovery, Defendants sought summary judgment and challenged Plaintiff's experts. First, on February 6, 2026, River Oaks filed a motion for partial summary judgement on

all claims except vicarious liability.  River Oaks Mot. [84].  The same day, Jackson HB filed a motion for summary judgment on all medical-malpractice claims (presumably direct and vicarious), Defs.' Mot. [89], which River Oaks joined, *see* Joinder [94].  Jackson HB also filed a motion, joined by River Oaks [91], to strike the opinions of Plaintiff's expert witnesses Dr. Todd A. Parker and Dr. Ronald H. Wharton, Mot. to Strike [86].  Finally, Jackson HB filed a motion for summary judgment on Plaintiff's punitive-damages claim, but Plaintiff did not respond. Jackson HB Mot. [92].

The Court has fully considered the premises and possesses personal and subject-matter jurisdiction.

II.     Motion to Stike [86]

Before considering the merits of Defendants' summary-judgment motions, the Court addresses their motion to strike expert opinions from Drs. Parker and Wharton.  *See* Mot. to Strike [86]; Joinder [91].

Dr. Parker is a board-certified emergency-medicine physician and an attending physician. *See* Parker Rep. [89-1] at 1.  Dr. Wharton is board certified in cardiovascular disease, works as an attending cardiologist, and teaches as an associate professor of cardiology.  Wharton Rep. [89-1] at 8.  They both offer expert opinions on the standard of care, breach, and causation. Defendants mostly accept their qualifications but say their testimony is unreliable and thus inadmissible under Federal Rule of Evidence 702.  The motion is denied.

A.      Standard of Review

Both parties rely heavily on Mississippi cases construing the similarly worded Mississippi Rules of Evidence.  "Although the substantive aspects of this case are governed by

[Mississippi] law, the Federal Rules of Evidence control the admission of expert testimony." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459 (5th Cir. 2002).

Federal Rule 702 addresses expert testimony and allows its admission if its proponent shows four elements by a preponderance of the evidence:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to ensure "any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993). In this case, Defendants do not challenge relevance. As for reliability, the Court assesses the validity of the expert's reasoning and methodology. *See id.* at 593. "[F]undamentally unsupported" opinions "offer[] no expert assistance to the [trier of fact]" and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). Thus, the Court must exclude any opinions based merely on subjective belief or unsupported speculation. *Daubert*, 509 U.S. at 590.

Factors pertaining to reliability may include (1) whether a technique has been tested, (2) whether it's been subjected to peer review and publication, (3) its potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson v. Tex. Dep't of Crim. Just.*, 393 F.3d 577, 584 (5th Cir. 2004). But these factors "do *not* constitute a

'definitive checklist or test.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 593).  Rather, courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Id.* at 152.

"The reliability analysis applies to all aspects of an expert's testimony:  the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia."  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).  "Where an expert's opinion is based on insufficient information, the analysis is unreliable."  *Paz v. Brush Eng'red Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009).  And "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Id.*

A witness, testifying as an expert, must also be "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject."  *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).

All that said, the Court's gatekeeper function doesn't replace the traditional adversary system or the jury's role.  *See Daubert*, 509 U.S. at 596.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Id.*  Thus, in determining the admissibility of expert testimony, the district court must accord the "proper

deference to the jury's role as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo*, 826 F.2d at 422). Whether the expert's opinions are correct is not for the Court to decide. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

B.     Analysis

Drs. Parker and Wharton offer similar core opinions. Though Ms. Ball was given a troponin test in the ER to determine whether she was having a heart attack, they believe she should have received a second troponin test after more observation. *See* Parker Rep. [89-1] at 2–3; Wharton Rep. [89-1] at 10. Had that test been done, they believe it would have detected the need for additional treatment and that she would not have died from cardiac arrest later that night. *See* Parker Rep. [89-1] at 7; Wharton Rep. [89-1] at 10.

Defendants object, arguing that Drs. Parker and Wharton "have absolutely no factual basis whatsoever upon which to support an opinion that Ms. Ball's death was actually caused by a heart attack as opposed to some other medical condition." Defs.' Mem. [87] at 3 (emphasis omitted). Thus, they say the opinion "as to the actual cause of death is speculative and must be struck." *Id.* Aside from that, they also challenge Dr. Wharton's qualifications as to two opinions in their reply and fault both experts for failing to identify a specific course of treatment that would have prevented Ms. Ball's death. The Court will address each point.

1.     Speculative and Conclusory Opinions

According to Defendants, Drs. Parker and Wharton failed "to take into account facts established by the family members' depositions" regarding the onset of symptoms and have "no autopsy, no abnormal EKG, and no abnormal laboratory testing which factually supports the experts' . . . opinion[s]." Defs.' Mem. [87] at 3, 10. They therefore see a "complete absence of

6

proof" supporting the opinion that Ms. Ball died of cardiac arrest. Defs.' Reply [105] at 7. Proof does, however, exist.

*Scientific methodology.* To begin, "[t]he proponent of an expert's testimony need not prove the testimony is factually correct, but rather need only prove by a preponderance of the evidence the testimony is reliable." *Paz*, 555 F.3d at 388 (citing *Moore*, 151 F.3d at 276). That requires opinions "ground[ed] in the methods and procedures of science" and "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. The court should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

Drs. Parker and Wharton have done that. Dr. Parker's initial report indicated that Ms. Ball "presented to the ED with a history & physical that is a 'textbook' case of how cardiac ischemia presents." Parker Rep. [89-1] at 2. He then described that history and those symptoms, including Ms. Ball's score on a clinical guideline (the HEART score and Heart pathway). *Id.* He noted that the HEART score carries "the highest-level recommendation in the American College of Emergency Physicians Clinical Guidelines for evaluation [of] chest pain." *Id.* Ms. Ball's HEART score (a four) "placed her in a moderate risk category and required at a minimum additional observation and testing in the ER." *Id.* at 3.

Dr. Parker also conducted a differential diagnosis ruling in cardiac arrest and ruling out other causes for her symptoms. *See id.* at 5; *see also* Parker Aff. [100-1] ¶¶ 24–28 (providing greater detail and excluding other causes of death). "A differential diagnosis 'is a patient-specific process of elimination that medical practitioners use to identity the "most likely" cause of a set of signs and symptoms from a list of possible causes.'" *Sylvester v. Talos Energy*

*Offshore, LLC*, No. 22-5192, 2024 WL 4343469, at *4 (W.D. La. Sept. 25, 2024) (quoting *Pick v. Am. Med. Sys., Inc.*, 958 F. Supp. 1151, 1162–63 (E.D. La. 1997) (quotation marks omitted)).  It is "a scientific technique that essentially involves the process of elimination."  *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 401 (5th Cir. 2016).  This is the same test used by doctors "in the relevant field," *Kumho Tire*, 526 U.S. at 152, and was in fact done by PA Lewis.  *See* Parker Aff. [100-1] ¶ 28.

The Fifth Circuit "has previously found a similar methodology to be reliable under *Daubert* when used by medical experts."  *Sims*, 839 F.3d at 401 (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 248 (5th Cir. 2002)) (reversing exclusion of expert testimony).  But such analysis is not per se admissible.  *Id.*  "While a 'medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness,' . . . the expert—to validly conduct differential diagnosis—must at least provide some explanation for ruling out alternative causes at trial."  *Greger v. C.R. Bard, Inc.*, No. 4:19-CV-675, 2021 WL 3855474, at *6 (E.D. Tex. Aug. 30, 2021) (citation omitted) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999)) (citing *Chrastecky v. C.R. Bard, Inc.*, No. A-19-CV-1240, 2020 WL 748182, at *6 (W.D. Tex. Feb. 14, 2020)).

Ultimately, "the district court has broad discretion to make the fact-specific inquiry in a given case as to whether such an approach is sufficiently reliable, especially in the absence of evidence 'ruling in' an expert's conclusion."  *Sims*, 839 F.3d at 402.  Here, the experts' differential diagnosis ruled in cardiac arrest and explained why other causes were excluded.  The methodology was sufficiently reliable to meet Plaintiff's burden under Rule 702.

**Sufficiency of supporting facts.**  According to Defendants, Drs. Parker and Wharton missed evidence and had no autopsy to consider.  Neither is dispositive.  "[O]nce the court has

found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." *Neely v. Great Escapes Pelahatchie*, LP, No. 3:21-CV-786-DPJ-ASH, 2024 WL 5125140, at *5 n.2 (S.D. Miss. Dec. 16, 2024) (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment)).  Because Plaintiff met Rule 702's burden, Defendants' other factual arguments go to weight.

### 2.    Dr. Wharton's Qualifications

In reply, Defendants claim Dr. Wharton is not qualified to offer two of his opinions. They first object to a new opinion in Dr. Wharton's affidavit.  According to Dr. Wharton, Ms. Ball would have survived if given treatment, including "medications and reperfusion therapy (either percutaneous coronary intervention or bypass surgery)."  Wharton Aff. [100-2] ¶ 28. Defendants say Dr. Wharton is unqualified to give this opinion because he is neither an interventional cardiologist nor a cardiovascular surgeon.  Defs.' Reply [105] at 2.

Normally, the Court "refuse[s] to consider arguments raised for the first time in reply briefs."  *Gillaspy v. Dall. Indep. Sch. Dist.*, 278 F. App'x 307, 315 (5th Cir. 2008).  But Dr. Wharton provided this opinion in an affidavit he filed in response to Defendants' *Daubert* motion.  That said, the Court still lacks any meaningful argument from Defendants or a response from Plaintiff.

In any event, Dr. Wharton is board certified in cardiovascular disease, completed a residency in internal medicine and a fellowship in cardiovascular disease, and is an associate professor of cardiology at the Zucker School of Medicine of Hofstra University in New York. Wharton Rep. [89-1] at 8.  He is also an attending cardiologist at a hospital in Manhasset, New York.  *Id.*  So even assuming he does not currently perform the procedures he noted, Defendants

have not explained why a cardiologist with his knowledge, skill, experience, training, and education would lack the expertise to explain how heart attacks are treated.

Defendants next complain that Dr. Wharton lacks the qualifications to agree with the coroner's finding that cardiac arrest caused the death. *See* Defs.' Reply [105] at 2 (citing *McKeown v. Pitcock*, 79 So. 3d 520, 523–25 (Miss. Ct. App. 2011)); *see also* Wharton Aff. [100-2] ¶ 24 ("I agree with the findings of Clifton Dunlap, Rankin County Deputy Coroner, that the immediate cause of death was cardiac arrest, secondary cause due to hypertension."). According to Defendants, "[Dr.] Wharton is not a pathologist[,] . . . may not bootstrap onto the 'opinion' in the death certificate," and his conclusion "should be excluded when the person signing the death certificate is not qualified to make such a determination." Defs.' Reply [105] at 2 (citing *McKeown*, 79 So. 3d at 523–25).

This is a new argument. While Dr. Wharton addresses the opinion again in his new affidavit, his original report noted the coroner's finding, *see* Wharton Rep. [89-1] at 9, and stated that "[m]ore likely than not, Ms. Ball died from complications of an acute myocardial infarction," *id.* at 10. Thus, Defendants could have initially asserted that Dr. Wharton needed to be a pathologist to testify regarding the cause of death. That argument would have allowed Plaintiff to respond. *See Gillaspy*, 278 F. App'x at 315. Additionally, under this Court's local rules, "*Daubert* motions challenging a designated expert must be filed no later than the deadline for dispositive motions." L.U. Civ. R. 26(a)(3). This qualifications argument is untimely, and the Court will not strike Dr. Wharton based on qualifications.

3.    Failure to Identify Specific Life-Saving Treatment

After arguing that Dr. Wharton is unqualified to address the specific procedures he believes would have saved Ms. Ball, Defendants fault Plaintiff's experts for failing to

10

"establish[] that timely diagnosis would have led to an identified course of treatment and that treatment would more likely than not, have prevented death within the relevant time window." Defs.' Reply [105] at 3 (citing *Univ. of Miss. Med. Ctr. v. Littleton*, 213 So. 3d 525, 538–39 (Miss. Ct. App. 2016)). But the experts' initial reports did not mention specific treatment, so Defendants could have faulted the experts for this omission in their opening brief. The argument is therefore untimely. *See Gillaspy*, 278 F. App'x at 315.

In sum, the Court denies Defendants' motion to strike Drs. Parker and Wharton.

III.    Motions for Summary Judgment

A.    Standard

Here again, the federal standards apply. Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th

11

Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  It must "interpret all facts and draw all reasonable inferences in favor of the nonmovant." *EEOC v. Rite Way Serv.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord Tolan v. Cotton*, 572 U.S. 650, 660 (2014).  But conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)); *accord Little*, 37 F.3d at 1075.

The party opposing summary judgment must identify specific evidence in the record and articulate the precise manner in which that evidence supports their claim.  *See Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."  *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992).  Disputed fact issues that are "irrelevant or unnecessary" to deciding the motion will not be considered by the Court.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

B.      Analysis

As a threshold matter, because subject-matter jurisdiction in this case is based on diversity of citizenship, the Court applies Mississippi substantive law.  *See Compliance Source, Inc. v. GreenPoint Mortg. Funding, Inc.*, 624 F.3d 252, 259 (5th Cir. 2010); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

Under that law, "a plaintiff alleging injury attributable to an employee's negligence has the option to sue the employee, the employer, or both." *Methodist Healthcare-Olive Branch Hosp. v. McNutt*, 323 So. 3d 1051, 1056 (Miss. 2021). Plaintiff elected to sue River Oaks and Jackson HB rather than their employees, Dr. Ross and PA Lewis. 2d Am. Compl. [25] at 6. Both Defendants seek summary judgment, and to avoid duplication the Court considers their motions on a claim-by-claim basis.

> 1.      Medical Negligence-Direct Liability (Count I)

Both Defendants seek summary judgment on Plaintiff's direct-liability, medical-negligence claims. *See* River Oaks Mot. [84]; Defs.' Mot. [89]. But they seek it on different grounds. The Court will therefore address the elements for medical malpractice in Mississippi and then separately consider Defendants' motions.

In Mississippi,

> [t]o present a prima facie case of medical malpractice, a plaintiff, (1) after establishing the doctor-patient relationship and its attendant duty, is generally required to present expert testimony (2) identifying and articulating the requisite standard of care; and (3) establishing that the defendant physician failed to conform to the standard of care. In addition, (4) the plaintiff must prove the physician's noncompliance with the standard of care caused the plaintiff's injury, as well as proving (5) the extent of the plaintiff's damages.

*Cheeks v. Bio-Med. Applications, Inc.*, 908 So. 2d 117, 120 (Miss. 2005).

"The success of a plaintiff in establishing these essential elements 'rests heavily on the shoulders of the plaintiff's selected medical expert,' because '[t]he expert must articulate an objective standard of care.'" *Est. of Sanders v. United States*, 900 F. Supp. 2d 730, 733 (S.D. Miss. 2012) (quoting *Est. of Northrop v. Hutto*, 9 So. 3d 381, 384 (Miss. 2009) (en banc)), *aff'd*, 736 F.3d 430 (5th Cir. 2013). "Not only must this expert identify and articulate the requisite standard that was not complied with, the expert must also establish that the failure was the

13

proximate cause, or proximate contributing cause, of the alleged injuries." *Hubbard v. Wansley*, 954 So. 2d 951, 957 (Miss. 2007) (en banc).

"[I]n the context of negligent medical care, a plaintiff must show that 'proper treatment would have provided the patient with a greater than fifty (50) percent chance of a better result than was in fact obtained.'" *Patton v. Mobile Medic Ambulance Serv., Inc.*, No. 3:07-CV-653-DPJ-JCS, 2009 WL 44206, at *4 (S.D. Miss. Jan. 6, 2009) (quotation marks omitted) (quoting *Hubbard*, 954 So. 2d at 964).

As applied to hospitals, Mississippi courts have recognized that a hospital "may be liable for its own negligence *and* the negligence of its employees." *St. Dominic-Jackson Mem'l Hosp. v. Newton*, 336 So. 3d 1089, 1093 (Miss. 2022) (emphasis added) (quoting *Clark v. St. Dominic-Jackson Mem'l Hosp.*, 660 So. 2d 970, 972 (Miss. 1995)); *see also St. Andrie v. Singing River Health Sys.*, 347 So. 3d 1197, 1198 (Miss. Ct. App. 2022) (noting plaintiff was permitted to add an "independent negligence" claim against hospital). But Mississippi also follows the "longstanding rule of law . . . that hospitals are generally not required to supervise independent physicians who practice there." *Newton*, 336 So. 3d at 1094 (citing *Hardy v. Brantley*, 471 So. 2d 358 (Miss. 1985)).

**River Oaks.** River Oaks attacks this claim on two fronts the Court will address. First, it argues that there is generally no duty to supervise doctors. River Oaks Mem. [85] at 5. Second, because it admits vicarious liability (should a jury find that PA Lewis or Dr. Ross acted negligently), the direct-liability claims merge and should be dismissed. *Id.* There are a number of issues to resolve before getting to these arguments.

To begin this analysis, the Court must first identify the direct-negligence claims against River Oaks. Count One of the Second Amended Complaint states:

14

> Defendants are directly liable as a result of the negligent failure to properly investigate, train, and screen the quality of services provided by the physicians and staff, and by failing to ensure that these individuals render adequate medical care to the patients as required by the standard of care of medical professionals.

2d Am. Compl. [25] ¶ 15.  Plaintiff then offers a laundry list of ways "Defendants" breached the standard of care.  *Id.* ¶ 16.  But those allegations all speak to medical negligence.  *See, e.g.*, *id.* ¶ 16(a) (alleging "[f]ailure to provide minimally competent healthcare treatment"); *id.* ¶ 16(b) (alleging "[f]ailure to adequately and proficiently monitor the health and physical well being of Ms. Ball").

Plaintiff has not pursued most of these theories beyond the pleading stage, offering neither evidence nor argument suggesting that River Oaks can be held directly liable for things like "[f]ailure to appreciate and/or recognize the gravity of Ms. Ball's medical condition." *Id.* ¶ 16(d).  And in any event, "it is the physician, not the hospital, who owes the primary duty to provide for the treatment of the patient." *Newton*, 336 So. 3d at 1094.

That said, Plaintiff's experts offered one opinion that pointed more directly to River Oaks.  Starting with Dr. Parker, he opined:

> It is uncertain at this time, but there is either negligence on the part of PA Lewis for not involving a physician in [Ms. Ball's] care, or on the part of Dr. Ross for not seeing the patient, or on the hospital for not requiring Dr. Ross to provide adequate supervision of PA Lewis.

Parker Rep. [89-1] at 7.  He further states that if this happened, then it would be an "institutional failure by . . . River Oaks." *Id.* at 6.  Dr. Wharton gave a similar opinion:  "River Oaks hospital's failure to have the patient evaluated by a medical doctor . . . was below the standard of care." Wharton Rep. [89-1] at 10.

River Oaks acknowledges this theory in its memorandum.  River Oaks Mem. [85] at 4.  But it argues that the opinion amounts to an improper claim that River Oaks should have better

15

supervised Dr. Ross. *Id.* at 5. Plaintiff does not dispute that characterization. She instead attempts to broaden the allegations. According to her, River Oaks acted negligently "in enforcing its own policies and ensuring that its hospital and medical staff were property trained and were following its own policies and procedures." Pl.'s Resp. [98] at 2. Though vague, that argument likely links with her contention that River Oaks "failed to require it's medical providers and hospital staff to adhere to" its policy requiring a qualified physician review all EKGs. *Id.* at 4.

Pausing here, Plaintiff says there is no notation in the medical chart that this policy was followed. *Id.* But she cites no record evidence to support the point, *see* Fed. R. Civ. P. 56(c)(1), whereas River Oaks attaches Dr. Ross's deposition testimony saying it shows "she interpreted the EKGs for all patients who presented to the [Emergency Department] that day." River Oaks Reply [103] at 6 (citing Ross Dep. [103-1]). Plaintiff hasn't shown otherwise, and, on this record, the Court will move to the other direct-liability theories Plaintiff mentions in response.

Policy enforcement aside, Plaintiff also claims River Oaks was obligated to take these steps:

- Establish appropriate emergency department protocols;

- Require adequate physician supervision of mid-level providers;

- Ensure risk-based escalation policies for moderate-to-high risk chest pain patients; and

- Monitor compliance with nationally recognized emergency cardiac guidelines.

Pl.'s Resp. [98] at 3. And she says River Oaks breached these duties in the following ways:

- Permitting discharge after a single troponin;

- Failing to mandate physician bedside evaluation;

- Failing to require escalation for HEART score $\geq 4$;

• Failing to ensure adequate supervision of a physician assistant managing moderate-risk chest pain; and

• Failing to have a physician certified in cardiology review the [EKG] in violation of the hospital's own policy.

*Id.* at 3–4.  Finally, Plaintiff mentions "negligent credentialing."  *Id.* at 2.

Most of these theories are not apparent from the Second Amended Complaint or the experts' reports.  River Oaks therefore objects to these new theories, *see* River Oaks Reply [103] at 3, and the Court agrees for two reasons.  First, other than the supervision theory, the new theories are unsupported by expert opinion or other cited evidence.  *See* Fed. R. Civ. P. 56(c)(1); *see also TIG Ins. Co.*, 276 F.3d at 759.  Second, to the extent these theories are not reflected in the Second Amended Complaint, "[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)).[1]

So that leaves the theory that River Oaks failed to "requir[e] Dr. Ross to provide adequate supervision of PA Lewis."  Parker Rep. [89-1] at 7.  Or, as Dr. Wharton put it, "River Oaks . . . fail[ed] to have the patient evaluated by a medical doctor."  Wharton Rep. [89-1] at 10.  As stated, River Oaks construed this theory to mean that it allegedly failed to supervise Dr. Ross's supervision of PA Lewis, and Plaintiff did not say otherwise.

---

[1] The Fifth Circuit frequently follows *Cutrera* and has done so as recently as this year.  *See H5r, L.L.C. v. Scottsdale Ins. Co.*, No. 25-10533, 2026 WL 252653, at *2 (5th Cir. Jan. 30, 2026).  But a separate line of Fifth Circuit cases says such responses should be viewed as motions to amend. *See, e.g., Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 989 n.2 (5th Cir. 2008) (collecting cases).  This Court will not infer a motion to amend from Plaintiff's summary-judgment response because the new theories would be futile without expert testimony; Local Rule 7(b) requires all motions be in writing; Local Rule 7(b)(3)(C) precludes "a counter-motion in the same document"; Local Rule 7(b)(2) requires a proposed amended complaint when leave to amend is sought under Federal Rule of Civil Procedure 15; and the deadline to amend as passed.

Starting with an obvious point, Dr. Parker's opinion doesn't necessarily prove that River Oaks failed to require supervision. He said, "It is uncertain at this time" whether the hospital was at fault "for not requiring Dr. Ross to provide adequate supervision of PA Lewis." Parker Rep. [89-1] at 7. And Plaintiff cites no record evidence establishing that alleged breach. *See* Fed. R. Civ. P. 56(c)(1).

Even if she had, the alleged breach is like the ones alleged in *Newton*. There, the plaintiff's expert "faulted the hospital for not *requiring* peer review by another physician." *Newton*, 336 So. 3d at 1093 (emphasis added). Specifically, the plaintiff's expert said that two specialists "should have been in a position to discuss the treatment with Newton's physician if the proper policies and procedures had been in place." *Id.* The Mississippi Supreme Court rejected this theory, noting that "under Mississippi law, hospitals do not have a duty to supervise physicians practicing at their facilities." *Id.* So too here. Plaintiff faults River Oaks for not supervising Dr. Ross's supervision of PA Lewis. River Oaks's motion [84] is granted.

Because Plaintiff has not supported a direct-liability claim against River Oaks, there is no need to take a deep dive into its second argument—"Mississippi law does not allow . . . direct liability claims when the targeted defendant has admitted its vicarious liability for the actor accused of the underlying negligence." River Oaks Mem. [85] at 5–6. That said, the Court finds that this alternative basis is likewise compelling.

As noted in *Evans v. Englund Equipment Co.*, "other courts in Mississippi . . . have concluded over several decades that when an employer admits vicarious liability, direct negligence claims for negligent hiring, training, supervision, retention, and entrustment asserted against the employer merge with a plaintiff's claims against the employee." No. 1:24-CV-304-HSO-BWR, 2025 WL 2164549, at *4 (S.D. Miss. July 30, 2025) (citing *Carothers v. City of*

18

*Water Valley*, 242 So. 3d 138, 144–45 (Miss. Ct. App. 2017), *cert. denied*, 246 So. 3d 67 (Miss. 2018)).  Like *Evans*, this Court makes the same *Erie* guess.  Indeed, the state could have rejected it by accepting *certiorari* in *Carothers*.  Under this rule, Plaintiff's supervision claims and other claims not properly before the Court—like failure to train and negligent credentialing—merge with the vicarious-liability claims.  River Oaks's motion [84] is granted on this alternative basis.

*Jackson HB.*  Jackson HB takes a different approach.  It did not join River Oaks's motion and did not assert that direct liability is foreclosed based on an admission that it would be vicariously liable for any negligence by its employees.  In fact, Jackson HB's summary-judgment motion does not differentiate between Plaintiff's direct- and vicarious-liability claims, arguing instead that there is no evidence supporting the causation element for a medical-negligence claim.  *See* Defs.' Mem. [90] at 4.

Jackson HB's motion aligns with and relies on its motion to strike Drs. Parker and Wharton.  Those experts both opined that with additional observation and testing, Ms. Ball had a better than 50% chance of surviving.  Parker Aff. [100-1] ¶ 33; Wharton Aff. [100-2] ¶ 28.  Without that testimony, Plaintiff cannot prove this essential element.  So as goes the motion to strike, so goes the summary-judgment motion.  *See* Defs.' Reply [106] at 1 (incorporating motion to strike as basis for arguing "Plaintiff fails to prove causation, and summary judgment should be granted").

As noted, the Court denied the motion to strike, finding that the opinions were reliable.  Those opinions—and the facts upon which they are based—create a material dispute.  The Court may not weigh this evidence against Defendants' evidence and must instead "interpret all facts and draw all reasonable inferences in favor of the nonmovant."  *Rite Way Serv.*, 819 F.3d at 239.

The Court denies Jackson HB's summary-judgment motion [89] and thus River Oaks's joinder [94] as to Count I.[2]

### 2.    Medical Negligence-Vicarious Liability (Count II)

Plaintiff alleges that both River Oaks and Jackson HB are vicariously liable for the negligence of their employees, PA Lewis and Dr. Ross.  2d Am. Compl. [25] at 6.  River Oaks "admits that it is vicariously liable for any negligence" committed by "either Mr. Lewis or Dr. Ross."  River Oaks Mem. [85] at 5.  And Jackson HB never claims otherwise.  But they both seek summary judgment arguing that Plaintiff has failed to create a fact question as to their employees' negligence.  *See* Defs.' Mot. [89]; River Oaks Joinder [94].

As noted, Jackson HB's memorandum makes no distinction between vicarious and direct liability, ostensibly arguing that neither exists for the same reasons Plaintiff's experts should be stricken.  So, for the same reason the Court rejected this argument when considering direct liability, it rejects the argument now.  Jackson HB's Motion [89] and River Oaks's Joinder [94] are denied as to Count II.

### 3.    Breach of Warranty (Count III)

Plaintiff's Amended Complaint brings breach-of-warranty claims against "all Defendants."  2d Am. Compl. [25] at 6.  River Oaks specifically sought summary judgment on this claim, but Jackson HB did not.  To the extent the claim may be encompassed in the arguments Jackson HB made for summary judgment of the medical-negligence claims—i.e., lack

---

[2] This creates an odd posture.  Had Jackson HB admitted vicarious responsibility and joined River Oaks's motion (or filed its own), then it probably would not face a direct-liability claim. But it didn't, so at this point the jury will hear a direct-liability claim against it but not River Oaks.  That said, it is unclear what Jackson HB did beyond providing the doctor and PA.

of causation evidence—that argument fails for the same reasons addressed in the previous sections.  The Court therefore focuses on River Oaks's position.

The briefing on this claim is thin.  River Oaks argues that to determine whether Plaintiff has presented breach of contract or tort, "the Court must look to the entire action to determine the true nature of the claim."  River Oaks Mem. [85] at 6 (citing *Leatherberry v. Am. Med. Response, Inc.*, No. 5:18-CV-18-KS-MTP, 2019 WL 1529394, at *4 (S.D. Miss. Mar. 18, 2019)).  Plaintiff responds with only this:

> Mississippi permits alternative pleading.  Miss. R. Civ. P. 8(d)(2).  Hospitals impliedly warrant that services will be rendered in a reasonably safe and competent manner.  *See generally Norman v. Anderson Reg'l Med. Ctr.*, 262 So. 3d 520 (Miss. 2019).  Whether this theory ultimately overlaps with negligence is not grounds for dismissal at summary judgment.  Plaintiff is entitled to pursue alternative legal theories based on the same operative facts.

Pl.'s Resp. [98] at 6.[3]

Both sides rely on *Norman*.  There, the plaintiff asserted medical negligence and breach of contract.  262 So. 3d at 523.  The trial court granted summary judgment of all claims, and the plaintiff appealed.  One of the issues was "[w]hether the trial court properly granted summary judgment of Norman's breach-of-contract claim."  *Id.* at 527.  The Mississippi Supreme Court first explained its general rule.

> Whether the patient brings an action in tort, in contract, or in both depends on the nature of the damages sought.  If the damages are for personal injuries, the action is one sounding in tort; however, if the damages are "intended to give the injured parties the benefit of their bargain," the action is one in contract.

*Id.* (citation omitted) (quoting *Murray v. Univ. of Pa. Hosp.*, 490 A.2d 839, 843 (Pa. Super. Ct. 1985)).  The court concluded that "Norman's breach-of-contract claim is nothing more than a

---

[3] River Oaks likewise relied on *Norman* in reply.  *See* River Oaks Reply [103] at 5.  That both parties rely on this authority suggests it represents a substantive rather than procedural rule.  Absent contrary argument, the Court will do the same.

medical-malpractice claim" because "the breach-of-contract claim is very clearly a general claim for breach of medical services." *Id.* at 528.

> First, Norman's complaint alleges that Anderson Regional breached a contract "to provide [Norman] reasonable medical services."  Second, Norman argued that Anderson Regional breached the "Conditions of Admission" by failing to provide "general duty nursing care" and by failing to inform the physician of changes to Norman's medical condition—Norman used Anderson Regional's admitted breach of the standard of medical care as proof to support the breach-of-contract claim.  Third, at the summary judgment hearing, the exchanges between the trial court and counsel for both Anderson Regional and Norman established that causation was the only issue before the court.

> Thus, by Norman's own admission, all of his claims, including the breach-of-contract claim, require proof that Anderson Regional's failure to timely recognize and report the stroke proximately caused Norman's damages.  Even under a breach-of-contract theory, Norman would have to prove causation.  *Leard v. Breland*, 514 So. 2d 778, 782 (Miss. 1987) (discussing the but-for causation standard for damages in a breach-of-contract case).  Stated differently, Norman's breach-of-contract claim sounds in tort rather than in contract, and, as such, it is nothing more than a claim for medical malpractice.

*Id.*

The same is true here.  Plaintiff says in her Second Amended Complaint that "[i]n consideration of Ms. Ball's agreement to pay for services rendered, Defendant impliedly warranted that Ms. Ball would be furnished with adequate, safe, and proper care."  2d Am. Compl. [25] at 7.  And Defendant's "fail[ure], refus[al] and/or negl[igence] to provide" this care were the "proximate causes" of her death and the "resulting losses and damages."  *Id.*  As in *Norman*, Plaintiff's breach-of-warranty "claim sounds in tort rather than in contract."  262 So. 3d at 528.  This part of River Oaks's motion is granted.

   4.   Wrongful Death (Count IV)

Plaintiff alleges a wrongful death claim against River Oaks and Jackson HB.  2d Am. Compl. [25] at 7.  Neither Defendant separately addresses this claim, apparently treating it as derivative of the medical-negligence claim.  To the extent Defendants request summary

22

judgment, the motion is denied for the same reasons the Court denied the motions to dismiss the vicarious-liability claims.

> 5.    EMTALA (Count V)

Plaintiff sued River Oaks, but not Jackson HB, under EMTALA. *Id.* at 8. Broadly speaking, River Oaks argues that these claims must be dismissed because Plaintiff didn't show River Oaks failed to comply with EMTALA's requirements. *See* River Oaks Mem. [85] at 6–7.

"EMTALA . . . was not intended to be used as a federal malpractice statute, but instead was enacted to prevent 'patient dumping', which is the practice of refusing to treat patients who are unable to pay." *Marshall v. E. Carroll Par. Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998). Plaintiff alleges claims for both inappropriate screening and failure to supervise. *See* 2d Am. Compl. [25] at 7–8.

***Appropriate screening.*** EMTALA includes a "Medical Screening requirement" and requires "[n]ecessary stabilizing treatment for emergency medical conditions and labor." 42 U.S.C. § 1395dd(a)–(b). Specifically, "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department." *Id.* § 1395dd(a). Further, if the "hospital determines that the individual has an emergency medical condition" it must provide either "(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility." *Id.* § 1395dd(b)(1)(A)–(B).

"In order to avoid summary judgment, [Plaintiff is] required to present evidence showing a material fact issue as to whether the Hospital provided an EMTALA appropriate medical screening examination." *Marshall*, 134 F.3d at 323. While EMTALA fails to define what

constitutes an "appropriate medical screening," *id.*, the Fifth Circuit has adopted the majority view. "Most of the courts that have interpreted the phrase have defined it as a screening examination that the hospital would have offered to any other patient in a similar condition with similar symptoms." *Id.* (collecting cases). Critically, "an EMTALA 'appropriate medical screening examination' is not judged by its proficiency in accurately diagnosing the patient's illness, but rather by whether it was performed *equitably in comparison to other patients* with similar symptoms." *Id.* at 322 (emphasis added).

Plaintiff says Ms. Ball's initial screening "violated the express provisions of EMTALA." 2d Am. Compl. [25] at 7. While she believes the screening was inadequate, she never addresses how her screening "compar[ed] to other patients." *Marshall*, 134 F.3d at 322. The same thing happened in *Marshall*, when the plaintiff relied on an affidavit from a nurse who was on duty that night. The Fifth Circuit affirmed summary judgment:

> Middlebrooks'[s] affidavit contains no description or identification of the other patients who allegedly came to the Hospital's emergency room with symptoms similar to those of Nydia Marshall, and provides no details of the kind of treatment those patients were given. It goes without saying that such conclusory, unsupported assertions are insufficient to defeat a motion for summary judgment.

*Id.* at 324. Here, Plaintiff acknowledges that the "screening must be comparable to that offered to similarly situated patients." Pl.'s Resp. [98] at 7. But like the *Marshall* plaintiff, she offers no record evidence of comparable patients and has failed to create a material dispute.

River Oaks also notes that Plaintiff's own expert says the initial screening was appropriate. *See* River Oaks Reply [103] at 5 (citing Parker Report [89-1] at 2, 6 (noting "the initial management plan after obtaining the history and physical was adequate, and initial testing was appropriate" and "the initial testing and evaluation was appropriate")).

24

As discussed above, whether PA Lewis and Dr. Ross were negligent for failing to order a second troponin test or further monitor Ms. Ball is a fact question of medical negligence for the jury. *See supra* at 19–20. But so long as the initial screening was adequate, a hospital "is not liable under EMTALA even if the physician who performed the examination made a misdiagnosis that could subject him and his employer to liability in a medical malpractice action brought under state law." *Marshall*, 134 F.3d at 322. Indeed, "a treating physician's failure to appreciate the extent of the patient's injury or illness, as well *as a subsequent failure to order an additional diagnostic procedure*, may constitute negligence or malpractice, but cannot support an EMTALA claim for inappropriate screening." *Id.* at 323 (emphasis added); *see also Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 880 (4th Cir. 1992) ("Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery."). The Court grants summary judgment as to the EMTALA screening claim.[4]

**Failure to stabilize.** Plaintiff also says River Oaks violated EMTALA's stabilization provision by failing to "stabilize [Ms. Ball's] condition prior to [her] being discharged from the hospital." 2d Am. Compl. [25] at 8.

"A hospital's duty to stabilize does not arise unless it has actual knowledge of the patient's unstabilized emergency medical condition." *Fewins v. Granbury Hosp. Corp.*, 662 F.

---

[4] Plaintiff asserts that the screening was inappropriate because "River Oaks deviated from its own chest pain protocols." Pl.'s Resp. [98] at 7. Assuming this again refers to the policies regarding EKGs, and assuming further that a deviation could prove an EMTALA claim without proof of comparator treatment, the allegation is unsupported. As discussed earlier, Dr. Ross, the attending physician for the ER on the day of Ms. Ball's screening, testified that she interpreted all EKGs for patients who presented to the ER that day. *See* Ross Dep. [103-1] at 4–5. Plaintiff does not refute this testimony, nor does she allege that Dr. Ross was unqualified to interpret the EKG. *See* Pl.'s Resp. [98] at 6–7.

App'x 327, 334 (5th Cir. 2016) (citing *Marshall*, 134 F.3d at 325).  At the summary judgment stage, "[t]o prevail on this issue, [Plaintiff] 'must identify evidence from which a jury could conclude that [River Oaks] had actual knowledge that [Ms. Ball] had an emergency medical condition and, if so, that [she] was not stabilized prior to the discharge." *Id.* (quoting *Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 559 (5th Cir. 2000)).

In the emergency room, Ms. Ball was diagnosed with "musculoskeletal" pain, ER Records [85-1] at 3, and she was given a document titled "Nonspecific Chest Pain," *id.* at 7. Even assuming a misdiagnosis, EMTLA liability does not attach for failure to correctly identify a patient's condition.  *Marshall*, 134 F.3d at 322.  Most critically, Plaintiff cites no evidence showing that River Oaks had actual knowledge of Ms. Ball's condition—"active coronary thrombosis or atherosclerosis."  2d Am. Compl. [25] at 8; *see* Pl.'s Resp. [98] at 7.

In sum, Plaintiff has not shown Ms. Ball received an inappropriate screening or that she had an emergency medical condition of which River Oaks had actual knowledge.  Thus, the Court grants River Oaks's motion for summary judgment on the EMTALA claim.

6.    Gross Negligence/Punitive Damages (Count VI)

In Mississippi, punitive damages may be awarded only if the claimant proves by clear and convincing evidence that the defendant "acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. § 11-1-65(1)(a).  "Punitive damages are to be assessed only in extreme cases, and since they are intended as an example and warning to others, they should be allowed only with caution and within narrow limits." *Wallace v. Thornton*, 672 So. 2d 724, 728 (Miss. 1996) (quotation marks omitted).

Both River Oaks and Jackson HB filed summary-judgment motions asserting that Plaintiff's evidence does not meet these standards. River Oaks included the argument in its motion seeking summary judgment on all direct-liability claims against it. *See* River Oaks Mot. [84]; River Oaks Mem. [85] at 7–8. Jackson HB filed a separate motion seeking partial summary judgment on this issue. *See* Jackson HB Mot. [92].

Plaintiff responded to neither. First, she requested and received an extension of time to respond to Jackson HB's motion. *See* Feb. 23, 2026 Text Order. But she declined to file a response within the extended deadline. Second, she failed to substantively address River Oaks's motion. She instead included this bullet point in the conclusion of her response: "Mississippi Supreme Court precedent expressly recognizes . . . [j]ury determination of punitive damages where evidence supports reckless disregard." Pl.'s Resp. [98] at 8.

By failing to respond to Jackson HB's motion, Plaintiff abandoned the punitive-damages claim against that defendant. "A plaintiff abandons claims when it fails to address the claims or oppose a motion challenging those claims." *Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 459 (5th Cir. 2022) (citing *Bedford v. Tex. Dep't of Transp.*, 810 F. App'x 264, 268 (5th Cir. 2020) (per curiam) (finding no error in district-court ruling that plaintiff abandoned claims by failing to respond to defendant's motion)). And her response to River Oaks could also be viewed as abandonment because she fails to address the motion on a substantive level. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

Even if she did not abandon as to River Oaks, Plaintiff has not satisfied Rule 56(c). Under that rule, she was required to cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations

27

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The Court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(3).

Thus, a party responding to a summary-judgment motion "must identify specific evidence in the record and articulate the manner in which that evidence supports [her] claim." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). For these reasons, the Court is under no "duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379–80 (5th Cir. 2010).

Here, Plaintiff merely states in her conclusion that Mississippi recognizes punitive damages, which is legally true but insufficient. She neither cites record evidence nor explains why it supports her claim. *Duffie*, 600 F.3d at 371. So even if she has not abandoned the claim, she did not meet her burden under Rule 56(c)(1). The Court grants River Oaks's motion [84] as to this claim and grants Jackson HB's motion for partial summary judgment [92].

IV.    Conclusion

The Court has considered all arguments. Any arguments not discussed would not have altered the outcome. River Oaks's motion for summary judgment on direct negligence [84] is granted. Defendants' motion to strike [86] is denied. Defendants' motion for summary judgment [89] and joinder [94] are denied. Jackson HB's motion for summary judgment on punitive damages [92] is granted.

**SO ORDERED AND ADJUDGED** this the 11th day of June, 2026.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE