**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
***NORTHERN DIVISION***

**PATRICIA BALL, Individually and as Administratrix of THE ESTATE OF FORMEKA BALL, Deceased, and on Behalf of All Wrongful Death Beneficiaries of FORMEKA BALL, Deceased** — **PLAINTIFF**

**VS.** — **CIV. NO. 3:24cv632-DPJ-ASH**

**RIVER OAKS HOSPITAL, LLC d/b/a MERIT HEALTH RIVER OAKS; JACKSON HB MEDICAL SERVICES, LLC; and JOHN DOES 1-10** — **DEFENDANTS**

---

**PLAINTIFF'S MEMORANDUM OF AUTHORITIES IN OPPOSITION TO DEFENDANT RIVER OAKS HOSPITAL, LLC'S MOTION FOR RECONSIDERATION OF MOTION TO STRIKE**

---

Plaintiff Patricia Ball, individually and as Administratrix of the Estate of Formeka Ball, deceased, and on behalf of all wrongful death beneficiaries of Formeka Ball, deceased, by and through counsel, respectfully submits this Memorandum of Authorities in Opposition to the Motion for Reconsideration of Motion to Strike [ECF 139] filed by Defendant River Oaks Hospital, LLC d/b/a Merit Health River Oaks ("River Oaks"). For the reasons below, the Motion should be denied.

## I. INTRODUCTION

River Oaks asks the Court to revisit its June 11, 2026 Order [ECF 127] (the "Order") denying exclusion of the causation testimony of Plaintiff's cardiology expert, Dr. Ronald Wharton, arguing that his September 2, 2026 deposition (Deposition of Ronald Wharton, M.D. [ECF 138-1], cited herein as "*Depo.*"), taken "for all purposes, including perpetuation of his testimony for trial," Depo. [ECF 138-1] at 5:12-16, "materially deviated" from his Report [ECF

89-1] and Affidavit [ECF 100-2] and exposed his opinions as unreliable. Mot. [ECF 139] at 1-2. It did neither.

Dr. Wharton's core opinions have not moved an inch since June 2025: Formeka Ball presented to the Merit Health River Oaks emergency department on October 2, 2023 with a textbook constellation of symptoms for acute coronary syndrome; the standard of care required serial troponin testing and a repeat electrocardiogram before she was sent home; that was not done; and, more likely than not, she died of a myocardial infarction that would have been diagnosed and successfully treated had the standard of care been followed. *See Comparison Chart of Dr. Wharton's Disclosed Opinions*, attached hereto as Exhibit "A". Those are the core opinions Dr. Wharton disclosed in his Report, swore to in his Affidavit, and designated to River Oaks in Plaintiff's Rule 26(a)(2)(B) expert disclosures more than a year before he was ever deposed. *See Id.*

Stripped of its rhetoric, River Oaks's brief rests on a single recurring premise: that Dr. Wharton did not review the depositions of Formeka Ball's family members before forming his opinions. Mot. [ECF 139] at 2 & n.9, 3 & n.16. That is true, and Dr. Wharton said so plainly and without hesitation at his deposition. But this fact does not undermine the reliability of his methodology; it confirms it.

Dr. Wharton's opinions address whether the emergency-department staff who evaluated Formeka Ball on October 2, 2023 met the standard of care based on what was actually in front of them that day: the triage complaint, PA Lewis's history and physical, her vital signs, her EKG, her labs, and the symptoms documented in the chart. Under settled Mississippi law, that is the correct, and indeed the required, frame of reference. A physician's conduct, and by extension a reviewing expert's opinion about that conduct, is judged "based on the information reasonably

available to the physician, i.e., symptoms, history, test results, results of the doctor's own physical examination, x-rays, vital signs, etc." *Hall v. Hilbun*, 466 So. 2d 856, 874 (Miss. 1985) superseded by statute on other grounds; *see also id.* at 871 (a physician may not be held liable "with the benefit of 20-20 hindsight" for information that was not before her).

The family members' deposition testimony, which only describes how Formeka felt that morning without any specific timeline of onset and what happened after Formeka Ball was discharged that evening and into the early morning hours before she was found unresponsive, was never part of, and could not have informed, the record the treating providers had before them when they decided to send her home at 12:24 p.m. on October 2, 2023. Report [ECF 89-1] at 2 (documenting the 12:24 p.m. discharge time). It was neither necessary nor appropriate for Dr. Wharton to review that after-the-fact testimony to render a reliable opinion on whether the ER's October 2 work-up and discharge decision satisfied the standard of care, and his testimony says exactly that. Moreover, the family testimony does not materially alter the factual basis for Dr. Wharton's causation opinion and does not undermine the reliability of the methodology this Court has already approved.

The remainder of River Oaks's brief catalogues points on which defense counsel pressed Dr. Wharton for additional detail across roughly four hours of deposition testimony, the kind of elaboration any competent expert gives when asked to walk through the reasoning behind an already-disclosed opinion. In short, Dr. Wharton's testimony was nothing more than permissible amplification, not new opinions. *See* Exhibit "A". Moreover, several of River Oaks's characterizations of that testimony, discussed below, do not hold up against the transcript itself. The rest present, at most, questions of weight and credibility for cross-examination before the

jury, not grounds to strike a properly disclosed opinion or to disturb an Order this Court has already entered.

## II. LEGAL STANDARD

### A. *Reconsideration of an interlocutory order is an extraordinary remedy.*

The Court's June 11, 2026, Order is interlocutory, and although Rule 54(b) affords broader discretion to revisit such an order than Rule 59(e) allows for a final judgment, that discretion is exercised sparingly, particularly where, as here, the movant does not point to an intervening change in controlling law but instead to testimony developed in the ordinary course of the discovery the Court's own scheduling order contemplated. Courts in this Circuit look to the Rule 59(e) standard for guidance: the movant must demonstrate a manifest error of law or fact, or newly discovered evidence that could not have been discovered earlier through the exercise of due diligence. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863-64 (5th Cir. 2003). Reconsideration "is not intended to give an unhappy litigant another chance to sway the judge." *Atkins v. Marathon LeTorneau Co.*, 130 F.R.D. 625, 626 (S.D. Miss. 1990).

As shown below, nothing in Dr. Wharton's deposition supplies grounds to revisit the Court's ruling.

### B. *This Court already held, on this record, that missing evidence goes to weight, not admissibility.*

River Oaks is not writing on a blank slate. When it and Jackson HB first moved to strike Dr. Wharton's and Dr. Parker's causation opinions, they argued the experts "have absolutely no factual basis whatsoever upon which to support an opinion that Ms. Ball's death was actually caused by a heart attack as opposed to some other medical condition," and that the opinion "as to the actual cause of death is speculative and must be struck." Memorandum in Support of Motion to Strike [ECF 87] at 3 (emphasis omitted), quoted in Order [ECF 127] at 6.

The Court rejected that argument on the merits: "Proof does, however, exist." Order [ECF 127] at 7. It held that the shared methodology Dr. Wharton and Dr. Parker used, a differential diagnosis that "ruled in" cardiac arrest from a myocardial infarction and explained why alternative causes were excluded, is the same technique the Fifth Circuit "has previously found . . . to be reliable under *Daubert* when used by medical experts." Order [ECF 127] at 8 (citing *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 401 (5th Cir. 2016) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 248 (5th Cir. 2002))); see *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) (setting out the reliability standard governing the admission of expert testimony under Fed. R. Evid. 702). "Here, the experts' differential diagnosis ruled in cardiac arrest and explained why other causes were excluded. The methodology was sufficiently reliable to meet Plaintiff's burden under Rule 702." Order [ECF 127] at 8.

The Court went further, addressing the precise objection River Oaks recycles here, that the experts supposedly lacked a sufficient factual basis because they had not considered certain other evidence: "According to Defendants, Drs. Parker and Wharton missed evidence and had no autopsy to consider. Neither is dispositive." Order [ECF 127] at 8. Quoting the 2023 Advisory Committee Note to Rule 702, the Court explained that "[o]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." Order [ECF 127] at 8-9 (quoting *Neely v. Great Escapes Pelahatchie, LP*, No. 3:21-CV-786-DPJ-ASH, 2024 WL 5125140, at *5 n.2 (S.D. Miss. Dec. 16, 2024), quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment). The absence of an entire category of forensic evidence, i.e. an autopsy, did not disturb the reliability of Dr. Wharton's opinion.

Likewise, the absence of three lay deposition transcripts predominately describing events that occurred *after Ms. Ball's discharge* is no different, and, for the reasons explained in Part III.B below, warrants no different result. The Court has also read the local rules to mean that *Daubert* challenges to a designated expert ordinarily belong before the dispositive-motions deadline, finding a new qualifications argument raised after that deadline "untimely." Order [ECF 127] at 10 (citing L.U. Civ. R. 26(a)(3)). River Oaks's renewed challenge comes more than seven months after that deadline and three months after the Court's ruling. To the extent it repackages the same "missing evidence" objection the Court already considered and rejected, that timing counsels against revisiting the Court's prior conclusion, not in favor of it.

### C. *Rule 37(c)(1) does not reach testimony that elaborates on a disclosed opinion.*

Rule 37(c)(1) sanctions the failure to disclose. It is not a vehicle for excluding deposition testimony simply because it is more detailed, or more confidently stated, than a written report. Rule 26(a)(2)(B) required Dr. Wharton's Report to contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). It did. An expert is not confined at deposition to the four corners of that report; he may explain, illustrate, and amplify the reasoning already disclosed without triggering exclusion. Section 26(a)(2)(B) does not limit an expert's testimony simply to reading his report. No language in the rule would suggest such a limitation. An expert is not confined at deposition to the four corners of his report; he may explain, illustrate, and amplify the reasoning already disclosed without triggering exclusion. *See*, e.g., *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006) ("Section 26(a)(2)(B) does not limit an expert's testimony simply to reading his report. . . . The rule contemplates that the expert will supplement, elaborate upon, explain and

subject himself to cross-examination upon his report."); *see also Collins v. Clear Spring Property & Casualty Co.*2:2025cv00251 (W.D. La. 2026) (same).

That is especially true here, because Dr. Wharton's deposition was not an ordinary discovery deposition testing the outer edges of a still-developing opinion. Before any substantive questioning began, Plaintiff's counsel stated on the record that the deposition was being taken "for all purposes, including perpetuation of his testimony for trial." Depo. [ECF 138-1] at 5:12-16. Dr. Wharton resides in Roslyn, New York, far more than one hundred miles from this courthouse, Depo. at 12:18-20, so his testimony is usable as substantive trial evidence under Fed. R. Civ. P. 32(a)(4)(B) whether or not he appears live.

Consistent with that purpose, Plaintiff's counsel insisted that objections be made on the record at the deposition itself rather than reserved to trial under "the usual discovery format." Stated conversely, Plaintiff did not agree to any reservation of objections except as to form or responsiveness. Defendants' counsel agreed, but only as to "curable" objections. *Depo.* at 8:1-18. The deposition proceeded accordingly, with Plaintiff's counsel examining Dr. Wharton first, followed by cross-examination from counsel for both River Oaks and Jackson HB, and then redirect examination. Examination Index, Depo. at 4 (listing examinations beginning at pages 12 and 121 (Wagar), 20 and 106 (Johnson), and 23 (Boykin)). Because Dr. Wharton's trial testimony has, in substance, already been given and fully cross-examined by every defendant, there is no future trial appearance left to ambush, and no incremental prejudice from testimony that explains and expands upon, rather than departs from, his disclosed opinions.

Even assuming arguendo that some portion of Dr. Wharton's deposition testimony could be characterized as supplementation beyond his written disclosures, exclusion would still be unwarranted under Rule 37(c)(1). In determining whether a Rule 26 violation is harmless, the

Fifth Circuit considers "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Tex. A&M Rsch. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003). Those factors weigh heavily against exclusion here.

Dr. Wharton's causation testimony is plainly important; River Oaks cannot demonstrate unfair surprise or prejudice because the challenged testimony concerns the same myocardial-infarction, serial-testing, cardiac-arrest, and treatment opinions disclosed long before his deposition; and River Oaks had a full opportunity to examine Dr. Wharton concerning those opinions during his deposition. Most importantly, Plaintiff did not fail to disclose a new causation theory—the deposition testimony merely explained and amplified opinions already disclosed in Dr. Wharton's report, affidavit, and expert designation. Rule 37 therefore provides no basis for the extraordinary remedy River Oaks seeks.

### D. *Rule 702's reliability inquiry is flexible, and disputes about an expert's factual basis go to weight.*

The Rule 702 gatekeeping inquiry is "flexible," and the reliability factors identified in *Daubert* "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). Once an expert clears that threshold, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004). A differential diagnosis need not be "perfect" to be reliable; it need only "rule in" a suspected cause and "rule out" alternatives

through a defensible methodology. *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 401-02 (5th Cir. 2016) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 246-48 (5th Cir. 2002)).

## III. ARGUMENT

### A. Dr. Wharton's Opinions Have Not Changed, and Were Disclosed Long Before His Deposition.

Dr. Wharton's June 29, 2025 report set out seven numbered conclusions: that acute coronary syndrome had to be ruled out; that a two-hour ER visit could not adequately do so; that Ms. Ball was, more likely than not, undergoing coronary thrombosis at the time of her discharge; that she more likely than not died of complications of an acute myocardial infarction; that River Oaks's failure to have a physician evaluate her was below the standard of care and caused or contributed to her discharge and death; that she was misdiagnosed with a musculoskeletal injury; and that appropriate cardiology evaluation and treatment would, more likely than not, have saved her life. *Report* [ECF 89-1] at 3-4. His February 24, 2026 Affidavit reaffirmed each of those points to "a virtual medical certainty." *Aff.* [ECF 100-2] ¶ 30. Plaintiff's Rule 26(a)(2)(B) designation, served on Defendants in June 2025 with the Report attached as an exhibit, disclosed the same substance: that River Oaks's and its staff's breaches proximately caused Ms. Ball's death, and that appropriate treatment on October 2, 2023 would more likely than not have saved her life. *Plaintiff's Rule 26(a)(2)(B) Designation of Expert Witnesses* at 3-4, [ECF 121-1]. At his deposition, asked to summarize his ultimate opinion, Dr. Wharton gave the same answer: the ER's evaluation fell below the standard of care of a minimally competent physician, that substandard evaluation caused her premature discharge and subsequent death, and had she been treated consistent with the standard of care she "would be alive right now." *Depo.* [ECF 138-1] at 98:24-99:25, 100:4-9. No new causation theory appeared for the first time at deposition. What

River Oaks calls "new opinions" are, on inspection, the foundation Dr. Wharton was asked to lay for opinions he had already given, including his walk-through of the HEART score, the ACC/AHA chest-pain guidelines, and the mechanics of troponin kinetics, not a departure from them. *Depo.* [ECF 138-1] at 40:6-45:25, 78:16-89:25. That kind of amplification is exactly what a deposition is for, and it does not trigger Rule 37(c).

### B. Dr. Wharton's Reliance on the Contemporaneous Emergency-Department Record — Rather Than the Family's Post-Discharge Deposition Testimony — Reflects a Sound Methodology, Not a Flawed One.

River Oaks repeatedly faults Dr. Wharton for not having reviewed the depositions of Formeka Ball's family members before rendering his opinions. Mot. [ECF 139] at 2, 3 & n.9, 3 & n.16. He did not dispute it. Asked directly, he explained why: "I have not read any of the depositions, therefore, I could not possibly know the content thereof." *Depo.* [ECF 138-1] at 103:21-23. Asked whether he was even furnished the transcripts before his deposition, he was equally direct: "No, I was never given them." *Depo.* [ECF 138-1] at 109:6-9. That is not evasion, and it is not the mark of an expert who cherry-picked a favorable record while ignoring an unfavorable one. It is the testimony of a cardiologist who was asked to evaluate whether the standard of care was met on October 2, 2023, based *on the medical record* that existed on that date, the only record the treating providers themselves had, or could have had, when they made the decision to discharge Ms. Ball at 12:24 p.m.

That is not a methodological shortcut. It is the methodology Mississippi law requires. "The critical closing focus" in a medical negligence case is on "the information reasonably available to the physician" at the time of the challenged decision. *Hilbun*, 466 So. 2d at 874. Mississippi courts have long been careful to guard against a physician, or an expert reviewing a physician's conduct, being judged "with the benefit of 20-20 hindsight." *Id.* at 871. The family

members' deposition testimony mainly describes events after Ms. Ball left the hospital: the evening of October 2, the overnight hours, and the morning of October 3, 2023, when she was found unresponsive by her daughter.[1] *See* Report [ECF 89-1] at 2. None of that testimony existed in any form, written or oral, when PA Lewis examined Ms. Ball, when her EKG and troponin were run, or when the decision was made to send her home. None of the family members were actually present at River Oaks with decedent at any time during her presentation on October 2, 2023. They could not have informed the ER's standard-of-care obligations that day because it did not yet exist. Dr. Wharton's task was to evaluate the reasonableness of the ER's conduct against what was knowable to it at the time, not to reconstruct after the fact exactly when Ms. Ball's symptoms worsened overnight, so the family testimony had no bearing on the opinion he was retained to give.

Indeed, even if Dr. Wharton had reviewed the family members' depositions, those transcripts would have added little, if anything, of medical significance to the opinions he was asked to give. The family members do not establish a specific onset time or duration for Formeka Ball's chest pain or other cardiac symptoms; at most, they confirm that she began feeling unwell that morning and remained generally unwell after her discharge. Danny Ball, for example, expressly testified that he could not recall whether the 10:42 a.m. text was the first time he knew she was ill, and that he could not remember anything before that text; his knowledge of the specific symptom description came from reviewing Formeka's contemporaneous text during his deposition. *See Excerpts from Danny Ball's Deposition* at pp. pp. 12–15, attached hereto as Exhibit "B". The family testimony therefore does not supply the missing precise timing information River Oaks claims Dr. Wharton should have considered, and its post-discharge

[1] The family members only knew decedent wasn't feeling well that morning prior to her admission and did not know the exact time of onset of her condition.

observations add nothing material to his opinion concerning the adequacy of the emergency-department workup and discharge decision. River Oaks itself characterizes the supposed omission as a failure to examine deposition testimony for the "onset/timing" of symptoms and post-discharge condition, but those depositions do not actually provide the precise onset information its argument assumes.

But Rule 702 does not require an expert to review every item produced in discovery before offering an admissible opinion. The pertinent question is whether the facts and data upon which the expert actually relied are sufficient and whether his methodology is reliable. This Court has already answered both questions in Plaintiff's favor.[2]

River Oaks, at most, has identified a subject they could have used for cross-examination: whether the family's account of Ms. Ball's symptoms overnight is consistent or inconsistent with Dr. Wharton's opinion about the timing and progression of her myocardial infarction. That is precisely the kind of dispute over an expert's factual basis that *Primrose* and its progeny commit to the jury, not to a Rule 702 exclusion order. *Primrose*, 382 F.3d at 562. To the extent the family's testimony bears on the separate question of exactly when overnight Ms. Ball's condition became irreversible, a question going to the mechanics of her death rather than to whether the ER met the standard of care on October 2, River Oaks remains free to explore that at trial. It is not a basis to strike Dr. Wharton's standard-of-care and general causation opinions, which do not depend on it, and it is not meaningfully different from the objection this Court

---

[2] River Oaks's brief also notes that Dr. Wharton had not, as of his February 2026 Affidavit, reviewed "any transcripts of the depositions of the parties in this case," and that this remained true through his own deposition. *Depo.* [ECF 138-1] at 24:14-17 ("Correct, and I still haven't."). What the Motion does not mention is that River Oaks itself never sought to change that. As the Motion concedes, "River Oaks did not move the Court to compel Plaintiff to elaborate on vaguely designated opinions" before the discovery and motions deadlines. Mot. [ECF 139] at 7.

already rejected when it held that the absence of an autopsy did not undermine the reliability of the same opinions. *See supra* Part II.B; Order [ECF 127] at 8.

Finally, River Oaks through counsel could have posed any supposedly critical fact from the family members' depositions to Dr. Wharton hypothetically, as an expert witness. They chose not to do so. River Oaks raises the lay deposition testimony about the decedent's symptoms and conditions as a defense to the disputed issue of cause of death. Fair enough. But it does not serve as any basis whatsoever to exclude the expert medical testimony regarding cause of death by the medical experts in this case.

### C. River Oaks's Remaining Examples Either Mischaracterize the Transcript or Present Ordinary Cross-Examination Fodder, Not Grounds for Exclusion.

**1. The hypertension history.** River Oaks represents that Dr. Wharton testified he was unaware Ms. Ball's hypertension had "resolved," and that "upon his being advised of this, the history was no longer pertinent to his opinions." Mot. [ECF 139] at 2 & n.3 (citing *Depo.* [ECF 138-1] at 115:11-116:20). That is not what the cited testimony says. At that exchange, defense counsel asked Dr. Wharton whether he was aware that four days *before her ER visit*, Ms. Ball's blood pressure was recorded as 118/76 and she was not then on blood pressure medication. Dr. Wharton responded that he did not recall that detail specifically, "but that doesn't change my opinion," and explained, as any cardiologist would, why a single normal reading days earlier does not erase a documented history of hypertension: blood pressure "is not static. It goes up and it goes down. One elevated blood pressure reading doesn't mean someone has chronic hypertension any more than one normal blood pressure reading means that they don't." *Depo.* [ECF 138-1] at 115:14-116:20. He maintained, rather than abandoned, hypertension as a HEART-score risk factor. Respectfully, the Motion's characterization of this passage does not survive a reading of the transcript it cites.

**2. The Certificate of Death.** River Oaks similarly represents that once Dr. Wharton was advised that no physician had countersigned the death certificate, "the Certificate/opinion was no longer pertinent to his opinions." Mot. [ECF 139] at 3 & n.5. Again, the transcript says the opposite.

Dr. Wharton agreed the certificate had not been countersigned by a physician and agreed he was there to offer his own independent opinion on cause of death, then testified: "I don't need a physician to sign the death certificate to corroborate *my* opinion." *Depo.* [ECF 138-1] at 106:14-19 (emphasis added). That is not a recantation of reliance on the certificate; it is Dr. Wharton explaining, accurately, that his cause-of-death opinion was independently formed from the medical record and does not rise or fall on a co-signature that a deputy coroner's certificate happens to lack. His Affidavit already disclosed that no autopsy was performed and that the certificate listed "cardiac arrest" as the immediate cause with hypertension as a contributing factor, and nothing about the physician-signature line changes that disclosed opinion. Aff. [ECF 100-2] ¶¶ 15-16, 24.

**3. The differential diagnosis and the "burden of proof" testimony.** River Oaks argues Dr. Wharton's differential diagnosis is circular because he "rules in" and "rules out" causes using the same presenting symptoms. That is the ordinary structure of a differential diagnosis, not a defect in one: an expert identifies the diagnosis the documented presentation supports and excludes alternatives for which the same record offers no objective support. *See Sims*, 839 F.3d at 401-02; *Pipitone*, 288 F.3d at 246-48.

Dr. Wharton did exactly that with respect to Dr. Arkava's alternative theories, including aneurysm, stroke, and brain hemorrhage, testifying that "not one of them" appeared on PA

Lewis's own differential and that "she had no symptoms to suggest any of those." *Depo.* [ECF 138-1] at 92:24-93:11, 93:16-25.

Nor did his description of the standard of care improperly shift the legal burden of proof at trial. His testimony that an ER provider must "assume, until proven otherwise, that the patient has the most dangerous thing that they can possibly have, and prove that they don't, for the patient's benefit, to ensure safety." *See Depo.* [ECF 138-1] at 76:3-7, describes the clinical "worst-first" approach to chest pain reflected in the ACC/AHA guidelines Dr. Wharton walked through in detail in his own deposition testimony. *Depo.* [ECF 138-1] at 39:6-45:25, 78:16-89:25. It says nothing about who bears the burden of proof in this lawsuit, which remains Plaintiff's and will be the subject of the Court's instructions to the jury.

**4. Revascularization and the Precise Coronary Anatomy.** River Oaks's criticism that Dr. Wharton could not identify the precise number, location, or severity of Ms. Ball's coronary blockages likewise presents neither a new opinion nor a new methodological defect. More importantly, the Court has already addressed the substance of this argument.

Defendants previously faulted Plaintiff's experts for failing to establish the precise treatment that would have prevented Ms. Ball's death, and the Court held that the argument was untimely because the alleged omission was apparent from the experts' reports and could have been raised in Defendants' opening Daubert briefing. Order [127] at 10–11.

Dr. Wharton's deposition does not transform that previously available argument into newly discovered evidence. Nor does uncertainty concerning the precise coronary anatomy undermine his disclosed opinion that Ms. Ball was experiencing an acute coronary syndrome requiring continued cardiac evaluation and, if confirmed, appropriate intervention. River Oaks was free to cross-examine Dr. Wharton concerning what the absence of an autopsy or

angiography prevents him from knowing and did so at the deposition; it is not entitled to use those evidentiary limitations to relitigate an admissibility issue this Court has already decided. Moreover, River Oaks benefits by its own negligence—its own failure to do follow up testing that would have revealed this anatomical information and evidence before discharge—if this proposition was law. It is not.

**5. The arrhythmia testimony and the language of certainty.** Dr. Wharton has consistently maintained, in his Report, his Affidavit, and his deposition, that the mechanism of death was cardiac arrest arising from an unrecognized, undertreated myocardial infarction. See Exhibit "A". Whether that arrest was ultimately mediated by a fatal arrhythmia or a mechanical complication of the infarct is, by his own candid acknowledgment, a sub-question on which no autopsy was performed and some uncertainty necessarily remains. *Depo.* [ECF 138-1] at 54:9-55:1, 73:20-25. A willingness to say so under oath is not "circular reasoning"; it is candor, and juries are entitled to weigh it as such. Either possibility leads to the same result: death.

Likewise, River Oaks makes much of Dr. Wharton describing a hypothetical second troponin result in his Report as something that "may have" shown an abnormal value, in his Affidavit as something that "would likely" have done so, and at his deposition, when asked to state his opinion "to a reasonable degree of medical certainty" (the formulation defense counsel used throughout the deposition, see, e.g., *Depo.* [ECF 138-1] at 29:13-18), as something he could say "with all medical certainty." That progression reflects an expert answering the specific question he was asked with increasing precision, not a new or different opinion. The underlying substantive point—that serial troponin testing was required by the applicable clinical guidelines and that River Oaks's own bylaws separately required specialized review of the ECG—has not moved. See Depo. [ECF 138-1] at 44:3–13, 52:5–19, 59:14–63:18.

### D. *Rule 56(f) Relief Is Not Warranted.*

River Oaks's alternative Rule 56(f) request fares no better. This Court has already held that Drs. Wharton and Parker's causation opinions "and the facts upon which they are based—create a material dispute." Order [127] at 19. Nothing identified in River Oaks's Motion eliminates that dispute. At most, River Oaks identifies matters for argument concerning the weight a jury should give to Dr. Wharton's testimony. Those matters cannot support summary judgment, particularly where the Court has already held that it may not weigh the competing expert evidence and must draw reasonable inferences in Plaintiff's favor. Accordingly, River Oaks's alternative request for relief under Rule 56(f) should likewise be denied.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny River Oaks's Motion for Reconsideration of Motion to Strike [ECF 139] in its entirety, and grant Plaintiff such other and further relief as the Court deems just and proper.

This the 11th day of September, 2026.

Respectfully submitted,

**PATRICIA BALL, Individually and as Administratrix of THE ESTATE OF FORMEKA BALL, Deceased, and on Behalf of All Wrongful Death Beneficiaries of FORMEKA BALL, Deceased, PLAINTIFF**

BY: */s/ Benjamin N. Philley*
**BENJAMIN N. PHILLEY**

OF COUNSEL:
KILPATRICK & PHILLEY, PLLC
Benjamin N. Philley MSB #101556
Post Office Box 2230
Madison, Mississippi 39130-2230
216 W. Jackson St.
Ridgeland, Mississippi 39157

Telephone: 601.856.7800
Facsimile: 601.856.7031
E-mail: bphilley@kplawms.com

NELSON WAGAR HICKMAN (*pro hac vice*)
SARAH WAGAR HICKMAN (*pro hac vice*)
WAGAR HICKMAN, PLLC
1425 West Causeway Approach
Mandeville, Louisiana 70471
Telephone (985) 888-8740
cwagar@wagarhickman.com
shickman@wagarhickman.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record.

This the 11th day of September, 2026.

*/s/ Benjamin N. Philley*
BENJAMIN N. PHILLEY